UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JILLIAN M. FLORENTINO,    )
              )
  Plaintiff,       )  Civil Action No. 3:24-CV-643-CHB
              )
v.           )
              )  **MEMORANDUM OPINION AND**
HARTFORD LIFE AND ACCIDENT  )      **ORDER**
INSURANCE COMPANY,    )
              )
  Defendant.      )

*** *** *** ***

This matter is before the Court upon cross-motions for judgment on the administrative record filed by Plaintiff Jillian M. Florentino (hereinafter, "Plaintiff"), [R. 16], and by Defendant Hartford Life and Accident Insurance Company (hereinafter, "Defendant"), [R. 17-1]. Plaintiff's motion alternatively requests the Court remand the matter for a "full and fair" administrative review. [R. 16, p. 21]. Each party filed a response to the other party's motion, [R. 18 (Plaintiff's Response); R. 19 (Defendant's Response)], as well as a reply. [R. 21 (Plaintiff's Reply); R. 23 (Defendant's Reply)]. Also before the Court is Plaintiff's Motion to Strike Declaration of Tricia J. Parker, [R. 22], which seeks to exclude Defendant's substitute exhibit filed at [R. 20-1]. Defendant responded to that motion at [R. 26], and Plaintiff replied at [R. 27]. These matters are therefore ripe for review. For the reasons that follow, the Court will grant Defendant's Motion for Judgment on the Administrative Record, deny Plaintiff's Motion for Judgment on the Administrative Record, and deny Plaintiff's Motion to Strike as moot.

## I. BACKGROUND

As part of a company employee benefit plan, Defendant issued a life insurance policy to the employer of Mr. Michael Florentino (hereinafter, "Decedent"). [R. 10-1, p. 15 (Administrative

Record or "A.R.")]. Defendant's policy (hereinafter, "the Policy") gave employees like Decedent the option to elect supplemental life insurance coverage. *Id.* at 18. During the 2023 open enrollment period, Decedent elected to enroll in $440,000 in supplemental life insurance coverage under the Policy. *Id.* at 107.

This supplemental coverage included a "Guaranteed Issue Amount" of $200,000 and an additional "Maximum Amount" of up to $500,000, of which Decedent elected for $240,000 in coverage. *Id.* at 17, 107. The Guaranteed Issue Amount did not require evidence of insurability, *id.* at 37, but Defendant's $240,000 in supplemental coverage did. *Id.* at 20. To provide evidence of insurability, Decedent completed a Personal Health Application (hereinafter, "PHA"). *Id.* at 107, 413. One question on the PHA asked:

> Within the past 5 years, have you used any controlled substances, with the exception of those taken as prescribed by your physician, **been diagnosed or treated for drug or alcohol abuse (excluding support groups)**, or been convicted of operating a motor vehicle while under the influence of drugs or alcohol?

*Id.* at 408 (emphasis added). In response to this question, Decedent checked "No." *Id.*

Plaintiff and Decedent submitted the application on December 19, 2023. *Id.* at 413. Defendant approved the coverage that same day. *Id.* at 401. The Policy contains the following clause:

> **Policy Interpretation:** *Who interprets the terms and conditions of The Policy?*
> We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA).

*Id.* at 35–36 (emphasis in original). The Policy also contains an "Incontestability" clause, which specifies that "[i]n the absence of fraud," life insurance benefits "cannot be contested after two years from its effective date," *id.* at 35, and that "[n]o statement . . . will be used in any contest

- 2 -

unless it is in writing and a copy of it is given to the person who made it, or to his or her beneficiary or Your representative." *Id.* at 36.

On February 20, 2024, Decedent died from acute fentanyl and acetyl fentanyl intoxication. *Id.* at 67, 318. His medical records revealed his struggle with opioid abuse throughout his adulthood, including within the five years preceding his death. *Id.* at 251, 255, 267, 294–95. In April of 2022, while visiting a medical clinic, Decedent's "[c]ontinuous opioid dependence" was discussed after he revealed that he had relapsed in January of 2022 and used opioids the morning of the appointment. *Id.* at 267. Over one year later and less than one month before his death, in January of 2024, Decedent received psychiatric care and revealed then that he was "currently smoking Percocets," had been to rehab three times, and had been sober for eight months at the most since he began using opioids at age seventeen. *Id.* at 251, 255.

On May 6, 2024, Defendant requested Decedent's medical records in order to verify Defendant's statements made in the PHA due to Decedent's death occurring within two years of his effective date of coverage. *Id.* at 112–13. After obtaining Decedent's medical records, Defendant referred them to its medical underwriting unit on August 9, 2024. *Id.* at 108. On August 12, 2024, the medical underwriting unit determined that, had Defendant had access to Decedent's medical records, it would not have approved supplemental life insurance coverage based on Decedent's "opioid dependence disorder." *Id.* at 246. Shortly thereafter, on August 20, 2024, Defendant notified Plaintiff that her claim for benefits was denied, the $240,000 in supplemental life insurance was rescinded, and she had sixty days to appeal. *Id.* at 153–55. Defendant indicated that its decision to rescind coverage was based on Decedent's "incorrect and untrue" statement on the PHA regarding his ongoing history of opioid dependence. *Id.* at 153–55.

Plaintiff, acting through counsel, administratively appealed the decision on October 2, 2024. *Id.* at 169–170. On October 8, 2024, Defendant acknowledged receipt of Plaintiff's appeal, and requested further communications to develop a response timeline if Plaintiff's counsel intended to submit a substantive appeal and required more time to do so. *Id.* at 160–61. Plaintiff's claim file was sent to Plaintiff's counsel on October 15, 2024, and delivered on October 18, 2024. *Id.* at 103, 71. After Defendant learned Plaintiff's counsel received a copy of the claim file, Defendant notified Plaintiff's counsel on October 22, 2024, that it would proceed with the appeal review using the information already contained in the claim file unless Plaintiff's counsel notified Defendant of his intent to supplement the appeal with additional information by October 29, 2024. *Id.* at 104. Plaintiff's counsel did not respond. *Id.* at 69–70.

Defendant upheld its decision on October 30, 2024, indicating that Plaintiff's administrative remedies had been exhausted. *Id.* at 105–09. Plaintiff then filed this suit, which arises under the Employee Retirement Income Security Act of 1974 (hereinafter, "ERISA"), 29 U.S.C. § 1132(a)(1)(B). Plaintiff, in a motion for judgment on the administrative record, now argues that Defendant's rescission of coverage was invalid, citing various state law provisions and the terms of the Policy in support. *See generally* [R. 16]. Defendant's own motion for judgment on the administrative record argues its rescission decision was proper under federal common law and the terms of the Policy. *See generally* [R. 17].

These motions are presently before the Court alongside Plaintiff's Motion to Strike, [R. 20]. Plaintiff's Motion to Strike seeks to exclude the Parker Declaration at [R. 20-1], a corrected version of the Parker Declaration at [R. 19-1]. Because the Court can resolve the parties' cross-motions for judgment on the administrative record without considering the Parker

- 4 -

Declaration, the Court need not address Plaintiff's Motion to Strike and will instead proceed straight to the merits.

## II.    ANALYSIS

ERISA permits benefits-plan participants to proceed to federal court to "recover benefits due" under the plan. 29 U.S.C. § 1132(a)(1)(B). Typically, where a plaintiff challenges a plan administrator's denial of benefits, "the validity of a claim to benefits . . . turn[s] on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Generally, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard . . . ." *Firestone*, 489 U.S. at 115. Under this standard, the court "takes a fresh look at the administrative record, . . . according no deference or presumption of correctness to the decisions of . . . [the] plan administrator." *Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894, 902 (6th Cir. 2020) (quoting *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 700–01 (6th Cir. 2014) (citation modified)). By contrast, the arbitrary and capricious standard is "extremely deferential" and "the least demanding form of judicial review." *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 547 (6th Cir. 2020). Under the arbitrary and capricious standard, a court should uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Jackson v. Blue Cross Blue Shield of Mich. Long Term Disability Prog.*, 761 F. App'x 539, 543 (6th Cir. 2019) (citing *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991) (quotations omitted)).

Before a court interprets terms in the plan, it typically determines which standard of review applies to establish whether any deference is owed to the administrator's decision denying benefits. *See Firestone*, 489 U.S. at 113–15. The standard of review turns on whether the plan gives the

administrator "the discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If the plan grants the administrator such discretion, the court reviews the administrator's denial of benefits under the arbitrary-and-capricious standard. *Davis*, 980 F.3d at 545 (quoting *Firestone*, 489 U.S. at 115); *Hogan v. Life Ins. Co. of N. Am.*, 521 F. App'x 410, 414 (6th Cir. 2013) (citing *Firestone*, 489 U.S. at 113–15). If the plan does not grant the administrator discretion, the court reviews the administrator's denial of benefits de novo. *Firestone*, 489 U.S. at 115; *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 889–90 (6th Cir. 2020).

Here, the parties dispute both the standard of review and the district court's interpretation of the plan.

### A. Standard of Review

Under the terms of the Policy, two clauses may grant Defendant discretionary authority and thereby warrant applying the arbitrary and capricious standard of review. First, the Policy Interpretation provision provides that Defendant has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." [R. 10-1, p. 35 (A.R.)]. Second, the Policy states that "Evidence of Insurability must be satisfactory to Us." *Id.* at 20. The Sixth Circuit has determined that each clause grants discretionary authority and supports reviewing the administrator's decision under the arbitrary and capricious standard. *Campbell v. Hartford Life & Accident Ins. Co.*, No. 21-5651, 2022 WL 620151, at *3 (6th Cir. 2022) ("full discretion and authority" provision); *Frazier v. Life Ins. Co. of North America*, 725 F.3d 560 (6th Cir. 2013) ("This Court has found 'satisfactory proof,' and similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries.") (citing *Perez v. Aetna Life*

*Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc); *Miller v. Metro Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991)).

Plaintiff argues, however, that the Court cannot consider these discretionary clauses despite the Sixth Circuit's decisions. Plaintiff first notes that she and Decedent resided in Texas during the policy term. [R. 16, p. 10]. As a result, Plaintiff claims the Policy Interpretation provision—which contains the first discretionary clause ("full discretion and authority")—does not apply by the terms of the Policy itself. *Id.* (citing [R. 10-1, p. 10 (A.R.) ("**Texas**: The **Policy Interpretation provision** . . . is not applicable.") (emphasis in original)]). Additionally, Plaintiff argues Texas's ban on discretionary clauses in life insurance prevents consideration of either potential discretionary clause, since the Texas law applies to "a policy, certificate, or rider . . . offered, issued, renewed, or delivered on or after February 1, 2011." *Id.* (citing 28 Tex. Admin. Code §§ 3.1201, 3.1203; Tex. Ins. Code §§ 1701.062, 1701.002). Defendant counters that these statutes do not apply for two reasons: (1) they are preempted by ERISA and do not fall within the ERISA Savings Clause exception; and (2) the ban is inapplicable on these facts.

Although the Sixth Circuit has found a Michigan statue similar to Texas's fell within the ERISA Savings Clause exception, *see Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 607 (6th Cir. 2009), the Fifth Circuit and the Northern District of Texas have each declined to address the specific Texas provisions at issue here. *See Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 250 (5th Cir. 2018); *Taylor v. Metro. Life Ins. Co.*, 366 F. Supp. 3d 810, 815 (N.D. Tex. 2019).

Regardless, in this case, the Court declines to decide the appropriate standard of review. Rather, as outlined below, Plaintiff's claim fails regardless of which standard of review the Court applies. The Court therefore need not decide the issue.

## B. Validity of Rescission

The parties agree that federal common law generally applies to ERISA cases concerning rescission. [R. 16, p. 12; R. 17-1, p. 7]. The Sixth Circuit likewise directs the same. *Campbell*, 2022 WL 620151, at *5 ("Federal common law rules control our interpretation of terms in an ERISA plan, 'tak[ing] direction from both state law and general contract law principles.'" (quoting *Perez*, 150 F.3d at 556)). Under federal common law, "an insurer is entitled to avoid an insurance policy if the insurer proves that the insured made a fraudulent or material[1] misrepresentation in his insurance application that justifiably induced the issuance of the policy." *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943 (6th Cir. 1997); *see also Campbell*, 2022 WL 620151, at *5 ("[A]n administrator may rescind coverage if the insured made a material misrepresentation in the insurance application.) (citation and quotations omitted)). "A misrepresentation is material if it materially affects the insurer's risk or the hazard assumed by the insurer." *Id.* (citation and quotations omitted).

The Sixth Circuit's decision in *Campbell* is instructive. 2022 WL 620151. There, the Sixth Circuit considered facts remarkably similar to these: a decedent falsely represented that he had no history of drug or alcohol abuse in response to the same PHA question quoted above, *see* [R. 10-1, p. 408 (A.R.)], but his medical records revealed a history of alcohol abuse that likely contributed to the esophageal cancer that took his life. *Campbell*, 2022 WL 620151, at *1–*2. As a result, the insurer rescinded life insurance coverage pursuant to the same "Incontestability" provision as Defendant's here. *Id.* at *2; *see* [R. 10-1, p. 35 (A.R.)]. Applying the arbitrary and capricious

---

[1] Defendant alleges that Decedent's misrepresentation was material, not that it was fraudulent or both fraudulent and material. *See* [R. 17-1, pp. 1 ("Decedent's misrepresentations were material to [Defendant's] decision whether to issue coverage . . . ."), 7 ("Decedent's application for life insurance coverage in this case contained . . . a material misrepresentation.")].

- 8 -

standard of review, the Sixth Circuit determined that "the administrator rationally determined that checking 'No' to [the question about drug and alcohol abuse] was a material misrepresentation." *Campbell*, 2022 WL 620151, at *5. According to the Sixth Circuit, the record included "ample evidence" supporting the administrator's decision, including the decedent's treatment for alcohol abuse in the year prior to applying for life insurance, his diagnosis of "alcohol dependence" by two physicians, and his statement to one physician that he could not control his alcohol intake. *Id.* In light of these facts, the Sixth Circuit concluded the decedent and his spouse made a "misrepresentation" by stating that the decedent had not been "diagnosed or treated" for "alcohol abuse," and this representation was "material" because the information about health history "'is extremely important to the underwriting decision.'" *Id.* at *5–*6 (quoting *Davies*, 128 F.3d at 943).

The Court struggles to distinguish the facts in the present case from *Campbell*'s, even if it accords no deference to the administrator's decision to deny coverage. Here, Decedent made the same misrepresentation as the decedent in *Campbell*, marking the same "No" response to the same PHA question. [R. 10-1, p. 408 (A.R.)]. Decedent also had a similar history of drug abuse and treatment at the time he made that misrepresentation, as he admitted to abusing opioids within three years of applying for life insurance and within months after applying. *Id.* at 251, 255, 267. Across two visits over those three years, Decedent was diagnosed with "continuous opioid dependence (disorder)" and "opioid dependence." *Id.* at 258, 267. And, these misrepresentations were likewise "material," as they "materially affect[] the insurer's risk or the hazard assumed by the insurer" by failing to disclose a heightened risk that Decedent might perish as a result of his opioid abuse—information "extremely important to the underwriting decision." *Davies*, 128 F.3d at 943. Taken together, Defendant's rescission met the requirements of federal common law under either the arbitrary and capricious standard applied in *Campbell* or the de novo standard.

Plaintiff pushes back in three ways, arguing Defendant's rescission was invalid because Defendant did not (1) establish Decedent's intent to deceive, (2) comply with the Policy terms permitting it to contest and rescind coverage, or (3) remit insurance premiums to Plaintiff, which Plaintiff describes as a prerequisite for rescission. The Court considers each argument in turn.

### 1. Intent Requirement

According to Plaintiff, there is a state law requirement that Defendant prove Decedent's intent to deceive in order to rescind, regardless of whether the Court looks to the law of the state of delivery (i.e., Ohio) or the law of the state of residency (i.e., Texas). [R. 16, p. 13].

However, the Sixth Circuit has noted that "[w]hile state law may guide us in determining the proper federal common law standards, we are not bound to apply a particular state's law." *Davies*, 128 F.3d at 943 (citing *Dingledine v. Central Reserve Life Ins. Co*., 934 F.Supp. 892, 898 (S.D. Ohio 1996)). And, the Sixth Circuit has also repeatedly found that an "insured's good faith is irrelevant" to the materiality analysis under federal common law. *Id.*; *Campbell*, 2022 WL 620151, at *7. Accordingly, the Court need not and will not impose an intent requirement on top of the requirements of federal common law. Even according no deference to the claims administrator's decision to rescind, Defendant's rescission is valid regardless of whether Decedent intended to deceive in making his misrepresentation.

### 2. Policy Terms

Plaintiff next claims Defendant failed to abide by the terms of the Incontestability provision in contesting and rescinding coverage. [R. 16, p. 14]. Specifically, Plaintiff argues Defendant was required to show before it could rescind coverage that (1) the PHA was signed by Decedent and Plaintiff and (2) a copy of the PHA was given to Decedent or Plaintiff, but Defendant demonstrated

neither. *Id.* at 14–15. The Court briefly cited a different portion of the Incontestability provision above, *see* [R. 10-1, pp. 35–36 (A.R.)], but the relevant portions read as follows:

> **Incontestability:** *When can the Life Insurance Benefit of The Policy be contested?* Except for non-payment of premiums, Your or Your Dependent's Life Insurance Benefit cannot be contested after two years from its effective date.
>
> In the absence of fraud, **no statement made by You or Your Spouse relating to Your or Your Spouse's insurability will be used to contest Your insurance for which the statement was made after Your insurance has been in force for two years. In order to be used, the statement must be in writing and signed by You and Your Spouse**.
>
> * * *
>
> All statements made by the Policyholder, the Employer or You or Your Spouse under The Policy will be deemed representations and not warranties. **No statement made to affect this insurance will be used in any contest unless it is in writing and a copy of it is given to the person who made it, or to his or her beneficiary or Your representative**.

[R. 10-1, pp. 35–36 (A.R.)] (emphasis added).

According to Plaintiff, the PHA was not signed by both Decedent and Plaintiff because Plaintiff's name was merely typed above the "Spouse Signature" line, while Decedent's name was DocuSigned. [R. 16, p. 15]; *see* [R. 10-1, p. 413 (A.R.)]. Similarly, Plaintiff claims no copy of the PHA was provided immediately after it was completed. [R. 16, p. 16]. Each failure, Plaintiff claims, foreclosed Defendant's ability to consider the PHA in its coverage or rescission determination, making Defendant's decision to decline coverage and rescind the policy invalid. *Id.* at 18.

Plaintiff's argument misreads the terms of the contract. The terms of an insurance policy must be read in the context of the whole policy. *Bondex Intern., Inc. v. Hartford Acc. And Indem. Co.*, 667 F.3d 669, 677 (6th Cir. 2011). Here, a proper interpretation of the contract terms *in context* reveals that the "signature" and "copy" requirements apply only *after* the two-year incontestability

- 11 -

window passes. The Sixth Circuit found as such in *Campbell* when it determined that because the insurer "rescinded coverage within two years from the effective date of the policy, . . . the incontestability clause did not apply." 2022 WL 620151, at *7. Notably, the incontestability clause there was identical to the Incontestability clause in the Policy here, including the copy and signature requirements. *See id.*; [R. 10-1, pp. 35–36]; *see also Campbell v. Hartford Life & Accident Ins. Co.*, No. 5:18-CV-194-JMH, at [R. 21] (E.D. Ky. Oct. 29, 2018) (quoting the Incontestability provision in the Administrative Record). Here, the insurer rescinded coverage within nine months of the policy's effective date, [R. 10-1, pp. 153, 401 (A.R.)], meaning Defendant *could* use any "statements" (i.e., the PHA) to contest the insurance *without* having to demonstrate the signatures thereupon were valid or provide a copy to Plaintiff.

Moreover, even if the "signature" and "copy" requirements applied to this action—which they do not—Defendant would still meet each requirement. Under Sixth Circuit caselaw, a "signature" merely refers to acknowledgement or ratification of a written document, and a typed signature indicates that acknowledgement. *See Pittman v. Experian Solutions, Inc.*, 901 F.3d 619, 637 (6th Cir. 2018) (interpreting Michigan law in the context of the "long history of the statute of frauds" whereby a signature included "any notation signifying adoption or assent to be bound" (citations omitted)). The state laws of Texas and Ohio likewise recognize typed signatures. *See Reinagel v. Deutsche Bank Nat. Trust Co.*, 735 F.3d 220, 227 (5th Cir. 2013) ("Texas law recognizes typed or stamped signatures, and presumably also scanned signatures, so long as they are rendered by or at the direction of the signer . . . ." (citing Restatement (Second) of Contracts § 134 (1981))); *State v. Sowell*, 71 N.E.3d 1034 (Ohio 2016) ("[A] person signs a document when he writes or marks something on it in token of his intention to be bound by its contents."). And, as

- 12 -

Defendant points out, if Plaintiff's concern lies in the potential forgery of her signature, that result would also foreclose coverage. *See* [R. 22, p. 6].

As to the "copy" requirement, reading the Incontestability provision as a whole and in context is once again crucial. Because a "copy" must be given if a statement is used in a contest, *see supra*, and the policy makes no mention of *when* a copy must be provided, logic dictates that Defendant must provide a copy *during* a contest—and Defendant did so during the administrative review process. [R. 10-1, pp. 45–46, 71, 103–04 (A.R.)]; *see also* 29 C.F.R. § 2560.503-1(h)(iii) (requiring administrators to "provide[], *upon request* and free of charge," copies of documents "relevant to [a] claim for benefits."). There is no indication in the administrative record that Plaintiff requested copies until October 2, 2024, when Plaintiff's counsel administratively appealed Defendant's decision to deny and rescind coverage, and Defendant promptly provided that information. [R. 10-1, pp. 169 (requesting the "insurance policy and, if applicable, certificate of coverage"), 71, 103–04 (A.R.)]. Taken together, Defendant would meet both requirements even if they applied to this action, which they do not. Even according no deference to Defendant's rescission decision, the rescission remains valid under the terms of the Policy.

### 3.  Remission of Premiums

Finally, Plaintiff argues Defendant was obligated to remit premiums as a "condition precedent" to its rescission, yet Defendant never did so. [R. 16, pp. 18–20]. Defendant counters that remitting premiums is not a condition precedent to rescinding coverage and that its notice to Plaintiff to contact Decedent's employer for premium reimbursement was sufficient. [R. 19, pp. 14–16]. According to Defendant, any failure by Plaintiff to seek or accept reimbursement from Decedent's employer cannot unwind Defendant's rescission. *See id.*

- 13 -

The administrative record reveals Defendant instructed Plaintiff to "contact [Decedent's employer] to inquire if you may be eligible for a premium reimbursement for coverage for which premiums may have been paid to [Defendant] by [Decedent], through payroll deduction." [R. 10-1, p. 155 (A.R.)]. Plaintiff cites to no policy terms requiring reimbursement of premiums as a prerequisite for rescission, *see* [R. 16; R. 18; R. 21], and the Court's review of the Policy finds none. *See* [R. 10-1, pp. 1–47].

As a general matter, Plaintiff's argument contradicts the requirements for rescission as articulated by federal common law, none of which mention premium reimbursement as a "condition precedent" to rescission. *See, e.g., Davies*, 128 F.3d; *Perez*, 150 F.3d; *Campbell*, 2022 WL 620151. Additionally, Plaintiff's supporting cases rely on irrelevant state law, which—as the Court has already discussed, *see supra* Section II(B)(1)—the Court is "not bound to apply" when determining the requirements for rescission under federal common law. *Davies*, 128 F.3d at 943. Further, none of the specific state laws Plaintiff cites are even potentially applicable in this case, as the state laws of Kentucky, Ohio, or Texas are not referenced; instead, Plaintiff points to the state laws of: (1) Michigan, *see* [R. 16, p. 19 (citing *Cont'l Assurance Co. v. Shaffer*, 157 F.Supp.829, 834 (W.D. Mich. 1957); *Burton v. Wolverine Mut. Ins. Co.*, 540 N.W.2d 480, 483 (Mich. App. 1995))]; (2) Georgia, *see id.* (citing *PHL Variable Ins. Co. v. Faye Keith Jolly Irrevocable Life Ins. Tr.*, 460 F. App'x 899, 902 (11th Cir. 2012)); (3) Pennsylvania, *see id.* (citing *Ocwen Loan Servicing, LLC v. Radian Guar., Inc.*, 2018 WL 684838, at *8 (E.D. Pa. Jan. 31, 2018)); (4) Florida, *see id.* (citing *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3 (Fla. App. 2006); *Pino v. Union Bankers Ins. Co.*, 627 So. 2d 535, 536-37 (Fla. App. 1993)); and (5) Rhode Island, *see id.* (citing *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 379 (1st Cir. 1991)). Moreover, some of Plaintiff's cases misrepresent the current law or stand for precisely the *opposite* conclusion

- 14 -

by declining to require premium remission as a condition precedent to for rescission. *See Avemico Inc. Co. v. Coupe*, 234 F.3d 1267 (6th Cir. 2000) ("There is no requirement in Michigan law that [Defendant] refund or offer to refund any unearned premium concurrent with a cancellation."); *Gonzalez*, 948 So. 2d, at *2 ("[W]e hold that the failure to return the premiums did not waive [the insurer's] right to deny coverage."). And, none of Plaintiff's cited cases refer to premium remission as a "condition precedent" to rescission, as a "prerequisite," or any other synonymous term. *See generally* [R. 16, p. 9].

Taken together, the Court is not persuaded that premium rescission is a prerequisite to rescission under federal common law. Plaintiff fails to cite any binding or even persuasive authority on this point, and the Court has likewise failed to locate any authority providing for a federal common law requirement that premiums must be remitted as a prerequisite to rescinding coverage under an ERISA plan, or any such requirement under the state laws of Kentucky, Texas, or Ohio. If anything, the administrative record suggests that if Plaintiff wanted reimbursement for premiums, she had to contact Decedent's employer to begin that process. *See* [R. 10-1, p. 155 (A.R.)]. The Court is not aware of any relevant authority suggesting that Plaintiff's failure to act invalidates Defendant's rescission.

## III.    CONCLUSION

For the above-stated reasons, the Court finds Defendant's decision to deny and rescind coverage is supported by the terms of the Policy and the applicable law, under *either* a de novo or arbitrary and capricious standard of review. Therefore, the Court will grant Defendant's Motion for Judgment on the Administrative Record and deny Plaintiff's Motion for Judgment on the Administrative Record. Because the Court can resolve the parties' arguments without considering the Parker Declaration at issue in Plaintiff's Motion to Strike, the Court will deny Plaintiff's

Motion to Strike as moot. Accordingly, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Motion for Judgment on the Administrative Record, [**R. 17**], is **GRANTED**.

2. Plaintiff's Motion for Judgment on the Administrative Record, alternatively Plaintiff's Motion to Remand for Full and Fair Review, [**R. 16**], is **DENIED**.

3. Plaintiff's Motion to Strike Declaration of Tricia J. Parker, [**R. 22**], is **DENIED AS MOOT**.

This the 16th day of March, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

- 16 -